IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| PATCH TECHNOLOGIES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:20-cv-42 |
| | § | |
| BJN TECHNOLOGIES LLC, | § | |
| BENJAMIN KAUFMANN, DOUG | § | |
| CONYERS, JONATHAN KAUFMANN, | § | |
| AND NICHOLAS KAUFMANN, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff PATCH Technologies, Inc. ("PATCH") files this Original Complaint against Defendants BJN Technologies LLC ("BJN"), Benjamin Kaufmann, Doug Conyers, Jonathan Kaufmann, and Nicholas Kaufmann (collectively, the "BJN Agents") (collectively, BJN and the BJN Agents shall be referred to as "Defendants") and would respectfully show the Court as follows:

## I.
### INTRODUCTION AND NATURE OF THE ACTION

1.      Defendants have surreptitiously attempted to steal the very technology and ideas that PATCH hired and paid them to manufacture.  PATCH is a revolutionary pill-bottle cap solution formed by two Trinity University Students to provide doctor-patient monitoring of prescribed dosages, support clinical trials, and many other purposes.  PATCH is now in a fight for its continued existence with BJN, the engineering firm it trusted and hired to assist PATCH in the refinement and development of PATCH's technology, ideas and strategies.  BJN seeks to steal PATCH's trade-secrets, and amazingly, claims BJN is the rightful owner of PATCH's technology

and ideas.   While PATCH was paying BJN for its work, unbeknownst to PATCH, BJN was clandestinely using PATCH's technology to create a competing product, even filing a patent application claiming ownership over PATCH's technology.   BJN is now holding PATCH's products and information hostage, refusing to return what PATCH has already paid for, and using PATCH's information to create a competing product. This lawsuit is necessary to protect PATCH'S trade secret information, prevent its use by Defendants, return PATCH'S trade-secrets, and cure the great harm already caused by Defendants.

## II.
### PARTIES

2.      Plaintiff PATCH Technologies, Inc. is a Texas corporation who does business in, and whose principal office is located in, Bexar County, Texas.

3.      Defendant BJN Technologies LLC is a Texas limited liability company whose members reside, and whose principal office is located, in Bexar County, Texas.   BJN may be served with process by delivering the Summons and this Original Complaint to its registered agent, Nicholas Kaufmann, 25214 Ima Ruth Pkwy, San Antonio, Texas 78257, or wherever else he may be found.

4.      Defendant Benjamin Kaufmann is an individual who resides in Bexar County, Texas, and may be served with process by delivering the Summons and this Original Complaint to Benjamin Kaufmann at 122 Broken Bough Lane, Shavano Park, Texas 78231, or wherever else he may be found.

5.      Defendant Doug Conyers is an individual who resides in Bexar County, Texas, and may be served with process by delivering the Summons and this Original Complaint to Doug Conyers at 7118 Bella Rose, San Antonio, Texas 78256, or wherever else he may be found.

6.      Defendant Jonathan Kaufmann is an individual who resides in Bexar County, Texas, and may be served with process by delivering the Summons and this Original Complaint to Jonathan Kaufmann at 327 Pagoda Oak, Shavano Park, Texas 78230, or wherever else he may be found.

7.      Defendant Nicholas Kaufmann is an individual who resides in Bexar County, Texas, and may be served with process by delivering the Summons and this Original Complaint to Nicholas Kaufmann at 25214 Ima Ruth Pkwy, San Antonio, Texas 78257, or wherever else he may be found.

### III.
### JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the claims brought herein raise a federal question under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*).  This Court has supplemental jurisdiction over all remaining claims pursuant to 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Defendants because the BJN Agents reside in the State of Texas, BJN's principal place of business is in the State of Texas, and BJN has continuous and systematic contacts with the State of Texas.  Defendants regularly conduct business in Texas and committed the acts complained of herein within this Judicial District of Texas.

10.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District.

**IV.**
**FACTUAL BACKGROUND**

**A.** **PATCH Develops Revolutionary Product in the Basement of the Trinity University Library to Combat the Opioid Crisis and Prescription Medication Adherence.**

11.     In 2017, Gavin Buchanan ("Buchanan") and Andrew Aertker ("Aertker") sat together as undergraduate students at Trinity University brainstorming for a class assignment in their entrepreneurship class.  One issue, in particular, repeatedly gripped the national headlines: the opioid crisis.  Despite the almost daily stories of the opioid crisis and its effects, Buchanan and Aertker noticed the lack of any real, meaningful solutions.  Being young, bright-minded students, the two looked for ways to solve the problem.

12.     Their original idea was to make pill bottles harder to open based on a study revealing that making pill bottles harder to open decreased suicide rates by 40 percent.  This feature also addressed the 21% spike in nationwide prescription painkiller abuse and heroin overdoses in 2015.

13.     However, upon conducting further market research (all while attending classes), Buchanan and Aertker also discovered that patients missing doses of prescription medication—both in normal routines and in clinical trials—also had an adverse impact on the nation's medical system and economy.  The two students found various studies demonstrating that approximately 50% of medications for chronic disease are not taken as prescribed, and that the overall lack of adherence causes approximately 125,000 deaths and at least 10% of hospitalizations in the country. Notwithstanding the presence of other "smart pill bottles" that had been unsuccessful, Buchanan and Aertker sought to innovate and create a smart pill-bottle cap designed to accurately report missed dosages to both the consumer and their doctor thereby increasing the accountability of the patient.

14.     Their eventual creation manifested itself after hours upon hours of hard work, dedication, patience, and perseverance.  Buchanan and Aertker taught themselves how to use 3-D print software and machines at Trinity University.  ███████████████████████████ ███████████████████████████████  Ultimately, they spent hundreds of hours in a Trinity University library basement printing new designs and ideas.  Their initial design was called the NODule and was a simple solution for a smart pill -cap.  It was developed as a simplistic solution to assist patients in reminding them and tracking when they took their medication. Of course, Buchanan and Aertker were also full-time students with a full course load during the product's development.

15.     Their hard work paid off with the creation of their new and more sophisticated smart pill-bottle cap.  In 2018, the pair developed the initial version of the smart pill-bottle cap of the future known as "PATCH"—the Pill-Administering Technology for Compliance Healthcare. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████  Below is a picture of PATCH's smart pill-bottle cap:



16. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

17.     The PATCH bottle and the PATCH app that went along with it solved a litany of

problems, including: ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

18.     After analyzing potential competitors, PATCH discovered that it was the only

company and solution that offered both a smart pill-bottle cap and an adherence software solution

at an affordable price.



19.     PATCH has, at all times, taken reasonable steps to keep secret the above-described physical design and operations of the PATCH bottle cap, its lighting system, business strategies and the related software (the "PATCH Trade Secrets").  The PATCH Trade Secrets give PATCH an advantage over PATCH's competitors and create independent economic value from not being readily ascertainable through proper means.  The PATCH Trade Secrets are not generally known by others in the pill bottle manufacturing business nor are they readily ascertainable by an independent investigation.

**B.     PATCH Achieves Immediate Success and Recognition at Trinity University and Beyond.**

20.     PATCH obtained immediate success.  In 2018, PATCH won a $5,000 prize in the preliminary round of Trinity's Stumberg Venture Competition (an annual, multi-stage contest

where students launch their own startups) and was one of five finalists in the competition.  PATCH went on to win a $10,000 award in the final round of the competition.  BJN's Doug Conyers ("Conyers") was present for the competition and was able to see PATCH's success first-hand.

21.     Throughout the summer of 2018, Buchanan and Aertker raised ███████ in private funding.  PATCH formed a team of trusted mentors, partners, FDA experts, and a legal team to pursue relevant intellectual property issues.  PATCH identified multiple, multi-billion-dollar markets that could use the PATCH technology, including ████████████████████ ███████████████████████████

22.     The company's anticipated revenue model was also simple and straightforward: █ ████████████████████████████████ ████████████████████████████████ ████████████████

23.     By the middle of 2019, in addition to its success at the Stumberg Competition, PATCH had been recognized or featured (i) as a top 20 startup in San Antonio, (ii) in a primetime NPR featured story, (iii) on JungleDisk's CyberTalk radio, and (iv) in a lead segment on scitechNow.  PATCH was also approved as a Class I medical device by the U.S. Food and Drug Administration ("FDA").

24.     Given PATCH's immediate acceptance, recognition, and success, PATCH was poised to begin final research, development, production, and sales of the product.

C.     **BJN—a Predatory Company Looking to Profit from Other's Ideas.**

25.     BJN markets itself as a San Antonio company that can "turn your ideas into reality." The company touts its "more than thirty years of combined professional experience" to "provide complete solutions to meet your needs."   BJN has four managers/team leaders: (i) Nicholas Kaufmann, (ii) Jonathan Kaufmann, (iii) Benjamin Kaufmann, and (iv) Conyers.

26.     Although BJN markets itself as focused on helping the inventor, its misconduct here speaks louder than the hollow words in its marketing materials.  Indeed, BJN has revealed itself to be a predatory company that is attempting to steal the ideas of Buchanan and Aertker, the very inventors and entrepreneurs who sought and paid for its services.

27.      Of particular surprise and disappointment to Buchanan and Aertker was the involvement at BJN of Conyers, with whom they placed particular trust and reliance separate and apart from any business relationship.   Conyers is a Trinity alumnus, current Vice President/President-Elect of the Trinity Alumni Association Board, and the current Chair of the Governance Committee for the Trinity Alumni Association.  When he was named as the "Alumni Sponsor" for the class of 2019, he said that he considered it his responsibility to give back to the University.  Conyers is also responsible for Trinity University's senior software project that would ultimately provide software to PATCH.

**D.      PATCH Retains BJN to Provide Research and Development for PATCH Technology.**

28.      PATCH first met BJN's manager, Conyers, and discussed the project with BJN before participating in the Stumberg Venture Competition.  Following its first success in the Stumberg Venture Competition, PATCH contacted BJN in the Summer of 2018 to assist in providing further research and development of the product.  Given BJN's connection to Trinity, BJN lead PATCH to believe that BJN would be a trusted asset in further development of the product.  BJN represented to PATCH that within 30 days, but no more than 67 days, that BJN would be able to deliver trial products that would include, variability for different pill sizes, temperature measurement, battery management/estimates, and requests for design changes to both the button and logo.  BJN was hired by PATCH as a "pair of hands" to assist in reducing PATCH's inventions into practice.

29.      In July 2018, BJN agreed to serve as a consultant in order to "provide research and

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                                     **PAGE 9**

development expertise to PATCH at an hourly rate based on a tiered pricing model." PATCH agreed to pay BJN the applicable hourly rates for the services performed in providing research and development engineering services related to the PATCH products. In order to provide these services, PATCH provided BJN with the PATCH Trade Secrets in order for BJN to accomplish the work requested and paid for by PATCH. PATCH provided the PATCH Trade Secrets to BJN for the sole purpose of BJN providing engineering services to improve the PATCH Trade Secrets. PATCH never believed that BJN would engage in the deceptive, profit-seeking scheme to take advantage of their invention. Although PATCH trusted BJN to help bring the product to market, that trust was misplaced.

**E.    BJN Begins Scheme to Utilize PATCH's Technology to Develop Its Own Competing Products.**

30.    Without PATCH's consent, permission, or knowledge, BJN took the PATCH Trade Secrets and began to work on designs (the "Stolen Technology") based on the PATCH technology. In other words, rather than providing the research and development services it agreed to provide to PATCH — BJN took the PATCH Trade Secrets and all of Buchanan's and Aertker's hard work, ideas, dedication, and perseverance to develop competing products that BJN hoped it could profit from and pass off as its own. Amazingly, BJN now claims to have created technology which can be added to pill-bottle caps that is "intended to aid consumers in reminding/alerting when medication could be taken." This product is clearly stolen from the PATCH technology that PATCH paid BJN to work on for PATCH. While BJN has hidden some of the functions of the Stolen Technology, below is a summary comparing the functionality and product specifications of PATCH's smart pill-bottle cap with checkmarks to show where BHN has admitted that BJN's claimed technology has the same functionality or specifications:



31.     BJN apparently believed it could take advantage of Buchanan's and Aertker's youth and relative inexperience in the business world in the hopes that it could obtain a windfall off the backs of full-time college students.

32.     The only discernible difference between what BJN claimed to create is that the BJN product is added to an existing pill-bottle cap and the removal of features already included in PATCH's smart pill-bottle cap. While the product PATCH was focused on initially manufacturing was more robust, the product BJN claimed to own simply removed features of PATCH's product,

---

[1] Each of the technology below is expressly included as part of PATCH's Trade Secrets.

[2] "Adherence" is a measure of patients taking medication as prescribed.

████████████████████████████████████████ What BJN claimed to create

simply removed this functionality, but still utilized all the other features and ideas identified above.

**F.     PATCH Attempts to Create a Mutually Beneficial Relationship; BJN Continues to Delay and Manufacture Facts Rather than the Product it was Paid to Manufacture.**

33.    Initially, PATCH hoped that there had merely been a misunderstanding between PATCH and BJN related to the technology and the services needed. Accordingly, PATCH approached BJN regarding its apparent intention to develop a similar product using PATCH's Trade Secrets. BJN explained to PATCH that BJN saw great promise in PATCH's ideas. BJN further explained to PATCH that BJN understood PATCH's legitimate concerns to protect PATCH's Trade Secrets. In order to comfort PATCH, BJN told PATCH that it should not worry because BJN would never market or sell the smart pill-bottle cap that it claimed to own if PATCH and BJN could not come to some sort of agreement. BJN claimed that if PATCH and BJN could not reach an agreement regarding the scope of BJN's "new technology", that BJN would simply continue to consult for PATCH at BJN's normal consulting rates and that BJN would abandon the simplified version of PATCH's pill cap bottle. BJN's assurances provided PATCH with enough comfort to attempt to explore options with BJN for a partnership or joint venture so that PATCH could continue development and the two companies could participate in a mutually beneficial arrangement.

34.    Although PATCH sought resolution, BJN began to manufacture delay rather than the products they were being paid by PATCH to work on. Indeed, BJN took every opportunity to attempt to explain away its malfeasance. For instance, in an August 2019 proposal, BJN unilaterally stated that PATCH's technology was limited to "assist with compliance during drug trials." This statement was self-serving and false. BJN also falsely proclaimed that "BJN's Engineering team has internally envisioned a consumer-based product that monitors and assists

customers in proactively reminding them to take their medication in a timely fashion." It defies logic that BJN independently "envisioned" the same idea and vision created by Buchanan and Aertker. BJN has failed to offer any evidence that they somehow independently "envisioned" the exact same idea as PATCH while being hired and paid by PATCH.

35.    Even while attempting to manufacture its own truth, BJN could not escape the reality that PATCH was solely responsible for the idea and the success of the PATCH Trade Secrets. In August and September 2019, BJN admitted,

> BJN acknowledges that PATCH has developed a company that has recently completed a round of funding a corporate valuation of $10M. BJN further understands that the work done to date has been *solely* under a consulting agreement and the success/growth of PATCH to date is ***solely due to the hard-work and efforts of the current ownership***.

(emphasis added).

36.    After exchanging various proposals describing the division of responsibilities between the companies and stock options issued to BJN, the companies appeared to arrive at a mutually agreeable relationship. Indeed, Conyers told Aertker and Buchanan on September 10, 2019, "[t]he proposal you guys provided to us is great. We're 100% onboard with the allocations, vesting schedules, strike prices, etc. Everything looks great." The proposal would have required Defendants to invest money into PATCH. Conyers claimed to "misunderstand[]" that in order to own any of PATCH, it would be necessary for BJN to pay for its ownership. Conyers went on to tout his experience with stock options and how BJN no longer wanted to move forward with the deal. Of course, this "miscommunication/misunderstanding" was a manufactured excuse created by BJN in the hopes that BJN could continue developing its competing technology and take advantage of Buchanan's and Aertker's own ideas and trade secrets.

37.    BJN's constant delays in the negotiating process, often on the flimsiest of pretexts,

dragged out PATCH's ability to obtain much needed financing. At the time that PATCH began negotiations with BJN, PATCH was in the midst of another round of raising funds. No matter how spurious, the dispute with BJN has caused harm to PATCH's ability to raise funds. Understandably, investors are reluctant to invest in PATCH while its own engineering firm is holding PATCH's proprietary materials hostage and claiming to have created a competing product using PATCH's Trade Secrets. BJN's conduct has pushed PATCH into a precarious financial situation, which was likely BJN's intent from the start. While PATCH always negotiated in good faith, even bringing in counsel early in the negotiating process to try to resolve any disputes, BJN never reciprocated PATCH's integrity. For example, even when the deal was allegedly close, BJN never hired counsel to finalize an agreement. The entire negotiation appears to have been a ploy by BJN to delay and harm PATCH.

38.     BJN's delays were not just limited to negotiation, but also production. BJN has failed to deliver critical ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ These failures also harmed PATCH's ability to bring its products and ideas to the market as well as to raise funds. Recently, PATCH was supposed to receive 30 smart pill-bottle caps from BJN that PATCH was then going to use with a study with the University of Texas. The design behind the study was to create ████████████████████████████████████ Once armed with an efficacy study, PATCH would be well-positioned to better market its smart pill-bottle cap. BJN, however, failed to timely deliver the 30 smart pill-bottle caps. Even when BJN did deliver the smart pill-bottle caps, it failed to provide the code, software, files and schematics necessary for the devices to work. Without the functioning smart pill-bottle caps that BJN promised, ████████████████████████████████████████████████

███████████████████████████████████  This timing is especially important in a technology-based business-like PATCH's business.  PATCH explained the harm BJN's refusal to deliver the smart pill-bottle cap has caused to PATCH.  Knowing the harm BJN is causing to PATCH, BJN continues to wrongfully refuse to deliver PATCH the code, software, files and schematics necessary for the 30 smart pill-bottle caps that PATCH bargained for to function.

## G.    BJN Ends Negotiations with PATCH and Refuses to Return the PATCH Technology.

39.    Even though BJN previously told PATCH it would not market or sell the simplified version of PATCH's product that was created by BJN using PATCH's Trade Secrets, upon information and belief, BJN continued secretly working on and developing its Stolen Technology.

40.    On November 11, 2019, Conyers informed PATCH that he had been removed from his role at BJN as it related to PATCH.  Conyers himself recognized after many-months of working for BJN and accepting payment from PATCH that he had a "conflict" due to his affiliation with Trinity, relationship with PATCH, and duties to BJN.  This self-admitted conflict was never disclosed to PATCH prior to hiring BJN nor has PATCH ever waived any conflict.

41.    On the very same day that BJN removed one of its executives due to a self-described "conflict," Jonathan Kaufmann then informed PATCH that BJN did not "see a viable path to come to a mutual agreement."  The communication from Jonathan Kaufmann, coming the same day as Conyers' resignation due to a "conflict," is a clear indication of an orchestrated and coordinated plan by Defendants.

42.    When it became clear that BJN and PATCH were not going to come to a negotiated agreement, PATCH started the process to locate an honest engineering firm it could hire to replace BJN and move forward with PATCH's product.  If misappropriating PATCH's trade secrets and technology to its own benefit were not enough, BJN then refused to return PATCH's Trade Secrets

or the work product paid for by PATCH.  Instead, presumably so it can utilize the Patch Trade Secrets in its continued quest to develop Stolen Technology, BJN is currently holding PATCH's Trade Secrets hostage based on a payment PATCH has tendered.  After paying BJN more than $90,000.00, on November 21, 2019, PATCH informed BJN that it would pay the balance of the amounts claimed owed to BJN upon receipt by PATCH of the work performed by BJN (such as native CAD files, electronic schematics, PCB layouts, the 30 prototypes, and the bill of materials for the clinical trial smartcap).  BJN refused to return PATCH's Trade Secrets or the products and work paid for by PATCH.

43.    BJN's refusal to return the PATCH Trade Secrets and the prototypes has far-reaching implications for PATCH.  BJN's retention of PATCH's Trade Secrets prevents PATCH from continuing in the development of its product and ultimate production and sale of the product. BJN is well-aware of this fact and even still refuses to return the PATCH Trade Secrets so it can gain an unfair competitive advantage in the marketplace.

44.    Not only has BJN refused to return the PATCH Trade Secrets, they have used their wrongful retention of the PATCH Trade Secrets to give themselves a head start in their efforts to develop a product to compete with the very idea that PATCH paid BJN to assist in developing for PATCH.

45.    In fact, instead of returning PATCH's technology and the prototypes, PATCH has recently learned that during the time that PATCH was negotiating with BJN that BJN surreptitiously filed an application for a patent based, on information and belief, on the Stolen Technology. BJN never disclosed to PATCH that BJN had hired lawyers to prosecute a patent application using the Stolen Technology. In fact, BJN has claimed that it seeks to resolve this dispute quickly so that it can market the Stolen Technology.

46.    BJN also sought to license PATCH's own technology back to PATCH in lieu of returning PATCH's property. BJN's actions from the start seem designed to steal the PATCH Trade Secrets and then force PATCH into a precarious financial position where PATCH would be forced to accept BJN's one-sided deal.

**V.**

**CAUSES OF ACTION**

A.    **COUNT I: Misappropriation of Trade Secrets (18 U.S.C. §§ 1832 and 1836)**

47.    PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

48.    BJN's conduct constitutes a misappropriation of trade secrets under the Defend Trade Secrets Act, codified at 18 U.S.C. §§ 1836 and 1839.  PATCH owns a number of trade secrets related to the PATCH Trade Secrets. PATCH has, at all times, kept the PATCH Trade Secrets secret. The PATCH Trade Secrets give PATCH an advantage over PATCH's competitors. The PATCH Trade Secrets are not generally known by others in the pill bottle manufacturing business nor are they readily ascertainable by an independent investigation. The PATCH Trade Secrets will be in included in products which PATCH intends to market and sell in all 50 states and possibly internationally.

49.    BJN acquired the PATCH Trade Secrets "under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use the of the trade secret …" 18 U.S.C. § 1839(5)(b)(ii)(II).  Namely, PATCH hired BJN to consult on the engineering of the PATCH products.  However, BJN used the PATCH Trade Secrets to develop the Stolen Technology and competing products.

50.    PATCH has been injured by BJN's misappropriation of the PATCH Trade Secrets by delaying the final production of the PATCH products.  Alternatively, PATCH seeks the

imposition of a reasonable royalty for BJN's unauthorized disclosure and use of the PATCH Trade Secrets.

51.     On information and belief, BJN's actions have been willful and malicious. Therefore, PATCH is entitled to exemplary damages within the statutory limits. PATCH further seeks its reasonable attorneys' fees.

52.     Because the future harm caused by BJN's disclosure of the PATCH Trade Secrets is not fully quantifiable, PATCH has no adequate remedy at law to BJN's continued possession, use or disclosure of PATCH's Trade Secrets. BJN's conduct has caused, and if not enjoined will continue to cause, irreparable damage to PATCH, including the potential disclosure and loss of the PATCH Trade Secrets, for which monetary relief will not fully compensate the harm to PATCH. Accordingly, PATCH is entitled to the following injunctive relief:

    a.  BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them should be preliminarily and permanently enjoined from manufacturing any products or items containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

    b.  BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them should be preliminarily and permanently enjoined from using any products or items containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

    c.  BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them should be preliminarily and permanently enjoined from selling or offering to sell any products or items containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

    d.  BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them, should be ordered to return to PATCH all PATCH Trade Secrets and all work product BJN performed for PATCH, including but not limited to, native CAD files, electrical schematics, PCB layout, all assembled prototypes, the bill of materials, and all technical specifications to all improvements or derivatives that BJN, or any third party, have made to the PATCH Trade Secrets or that incorporates the PATCH Trade Secrets, including the Stolen Technology.

53.     PATCH is further entitled to damages in an amount to be proved at trial including

enhanced damages as allowed by law. PATCH is further entitled to recover from BJN the gains, profits, and advantages that BJN has obtained as a result of BJN's wrongful acts and omissions. PATCH is further entitled to recover a royalty payment for BJN's unlawful use of the PATCH Trade Secrets. Finally, PATCH is entitled to its reasonable attorneys' fees.

**B.**   **COUNT II: Misappropriation of Trade Secrets (TEX. CIV. PRAC. & REM. Code §134A.002)**

54.   PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

55.   BJN's conduct constitutes a misappropriation of trade secrets under the Texas Uniform Trade Secrets Act, codified at TEX. CIV. PRAC. & REM. CODE §§ 134A.002-134A.004. PATCH owns a number of trade secrets related to the PATCH Trade Secrets.  PATCH has, at all times, kept the PATCH Trade Secrets secret. The PATCH Trade Secrets give PATCH an advantage over PATCH's competitors. The PATCH Trade Secrets are not generally known by others in the pill bottle manufacturing business nor are they readily ascertainable by an independent investigation.

56.   BJN acquired the PATCH Trade Secrets "under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret …" TEX. CIV. PRAC. & REM. CODE § 134A.002(3)(B)(ii)(b).  Namely, PATCH hired BJN to consult on the engineering of the PATCH Trade Secrets.  However, BJN used the Patch Trade Secrets to develop the Stolen Technology and, upon information and belief, other competing products.

57.   PATCH has been injured by BJN's misappropriation of the Patch Trade Secrets by delaying the final production of the PATCH products and through BJN's attempt to develop and profit from the Stolen Technology.  PATCH has also been prevented from raising the additional funds necessary for the final product of the PATCH products.

58.     On information and belief, BJN's actions have been willful and malicious. Therefore, PATCH is entitled to exemplary damages within the statutory limits. TEX. CIV. PRAC. & REM. CODE § 134A.004(b).

59.     Because the future harm caused by BJN's use and disclosure of the PATCH Trade Secrets is not fully quantifiable, PATCH has no adequate remedy at law to BJN's continued possession, use, or disclosure of the PATCH Trade Secrets. BJN's conduct has caused, and if not enjoined will continue to cause, irreparable damage to PATCH, including the potential disclosure and loss of the PATCH Trade Secrets, for which monetary relief will not fully compensate the harm to PATCH. Accordingly, PATCH is entitled to the following injunctive relief:

a.   BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them should be preliminarily and permanently enjoined from manufacturing any products or items containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

b.   BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them should be preliminarily and permanently enjoined from using any products or items containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

c.   BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them should be preliminarily and permanently enjoined from selling or offering to sell any products or items containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

d.   BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them, should be ordered to return to PATCH all PATCH Trade Secrets and all work product BJN performed for PATCH, including but not limited to, native CAD files, electrical schematics, PCB layout, all assembled prototypes, the bill of materials, and all technical specifications to all improvements or derivatives that BJN, or any third party, have made to the PATCH Trade Secrets or that incorporates the PATCH Trade Secrets, including the Stolen Technology.

60.     PATCH is further entitled to damages in an amount to be proved at trial including enhanced damages as allowed by law, the gains, profits, and advantages that BJN has obtained as a result of BJN's wrongful acts and omissions, and a royalty payment for BJN's unlawful use of

the PATCH Trade Secrets.

**C.    COUNT III: Breach of Contract**

61.    PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

62.    PATCH and BJN entered into a valid contract for BJN to "provide research and development expertise to PATCH at an hourly rate based on a tiered pricing model." PATCH agreed to pay BJN the applicable hourly rates for the services performed in providing research and development engineering services related to the PATCH products. PATCH and BJN also agreed that BJN would construct 30 prototypes of the PATCH products.

63.    PATCH has tendered payment of the vast majority of amounts owed to BJN and offered to pay the balance when it received the prototypes it hired BJN to produce for PATCH. However, BJN refused to deliver the prototypes to PATCH. Therefore, BJN is in breach of the parties' agreement.

64.    BJN's breach has injured PATCH by preventing PATCH from finalizing the marketing and development of the PATCH products. PATCH has also been prevented from raising the additional funds necessary for the final commercial version of the PATCH products.

65.    PATCH is entitled to damages in an amount to be proved at trial, including recovery of all reasonable attorneys' fees and costs incurred in connection with this action pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(8).

**D.    COUNT IV: Conversion**

66.    PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

67.    PATCH is the lawful owner of 30 prototypes of the PATCH products, including the code, software, files and schematics necessary for the devices to work, and is entitled to

possession of the code, software, files and schematics necessary for the 30 prototypes of the PATCH products to function.

68.     BJN continues to withhold the code, software, files and schematics necessary for the 30 prototypes of the PATCH products to function from PATCH even after PATCH has tendered payment for 30 prototypes in accordance with the parties' agreement.

69.     PATCH has demanded the return of the code, software, files and schematics necessary for the 30 prototypes to function, including through a November 27, 2019 demand letter (the "Letter"). In the Letter, PATCH gave BJN until December 6, 2019 to return the 30 prototypes and the code and files.

70.     Despite PATCH's lawful demands, BJN has refused to return PATCH's property.

71.     BJN's withholding of PATCH's property has injured PATCH by preventing PATCH from finalizing the marketing and development of the PATCH products.  PATCH has also been prevented from raising the additional funds necessary for the final version of the PATCH products.

72.     Upon information and belief, BJN acted with malice in withholding the PATCH's property.

73.     PATCH is entitled to damages in an amount to be proven at trial, including enhanced damages as allowed by law.

**E.     COUNT V: Breach of Fiduciary Duty**

74.     PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

75.     Defendants owe PATCH both a formal and informal fiduciary duty.  PATCH placed Defendants in a position of trust and confidence that involved access to their confidential information.  Furthermore, pursuant to the consulting agreements, BJN is PATCH's agent. As

PATCH's agent, BJN owed PATCH (1) a duty of loyalty and utmost good faith; (2) a duty to refrain from self-dealing; (3) a duty to act with integrity of the strictest kind; (4) a duty of fair, honest dealing; and (5) a duty of full disclosure.

76.     Defendants breached their duties to PATCH by using PATCH's trade secrets, including the PATCH Trade Secrets, to develop competing products for BJN.  BJN has further breached its duties to PATCH by withholding PATCH's property, including the 30 prototypes.

77.     Defendants' breaches have directly caused PATCH's injuries by preventing PATCH from finalizing the marketing and development of the PATCH products. PATCH has also been prevented from raising the additional funds necessary for the final version of the PATCH products.

78.     Upon information and belief, Defendants acted with malice in breaching their fiduciary duties to PATCH. Therefore, PATCH is entitled to exemplary damages.

79.     PATCH is entitled to damages in an amount to be proven at trial, including enhanced damages as allowed by law. PATCH also seeks the disgorgement of all illicit profits which Defendants have obtained through their breaches for fiduciary duty.

**F.     COUNT VI: Breach of Implied-in-fact Contract**

80.     PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

81.     PATCH and BJN entered into an implied confidentiality agreement.  BJN agreed to serve as a consultant in order to "provide research and development expertise to PATCH …" PATCH provided BJN with the confidential PATCH Trade Secrets in order for BJN to accomplish the work requested and paid for by PATCH. The parties entered into an implied confidentiality agreement as BJN needed PATCH's confidential information to perform its contractual services.

82.     PATCH performed, or tendered performance of, all obligations owed under the

parties' agreement by providing BJN with the confidential information and paying, or tendering payment of, all amounts owed under the parties' agreements.

83.     BJN breached the confidentiality agreement by using PATCH's confidential information to create the Stolen Technology.

84.     PATCH has been injured by BJN's misappropriation of trade secrets by delaying the final production of the PATCH products.

85.     PATCH is entitled to damages in an amount to be proven at trial, as well as recovery of all reasonable attorneys' fees and costs incurred in connection with this action.

G.     **COUNT VII: Quantum Meruit**

86.     PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein, and brings this claim in the alternative to its breach of contract claim.

87.     PATCH provided BJN with valuable materials, namely the PATCH Trade Secrets. PATCH provided BJN with this information so that BJN could "provide research and development expertise to PATCH" pursuant to the parties' consulting agreement.

88.     Instead of offering expertise to PATCH, BJN used the PATCH Trade Secrets to develop its own products to the exclusion of PATCH.

89.     BJN is aware that it was only able to develop its own products because of the PATCH Trade Secrets.  BJN is also aware that it was only provided the PATCH Trade Secrets as part of the parties' consulting agreement.  Once PATCH became aware that BJN had used the PATCH Trade Secrets, PATCH demanded that BJN reimburse PATCH for BJN's use of the PATCH Trade Secrets.

90.     Based upon fundamental principles of justice, equity, and good conscience, this Court should aware PATCH its actual damages in an amount to be proven at trial, as well as recovery of all reasonable attorneys' fees and costs incurred in connection with this action.

**H.**     **COUNT VIII: Unfair Competition (Texas Common Law)**

91.     PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

92.     BJN's conduct constitutes unfair competition under Texas common law. BJN used Conyers' relationship with Trinity, Buchanan, and Aertker to obtain the PATCH Trade Secrets which includes PATCH's trade secrets and confidential information. BJN was allegedly to use this information to "provide research and development expertise to PATCH . . . ." Instead, BJN used the PATCH Trade Secrets to develop the Stolen Technology to compete directly with PATCH. BJN has also withheld the PATCH Trade Secrets and prototypes from PATCH despite PATCH tendering payment of all amounts owed.

93.     In addition to developing the Stolen Technology to compete directly with PATCH, BJN has interfered with PATCH's ability to conduct business by withholding the PATCH Trade Secrets and the prototypes. This prevented PATCH from obtaining additional investors and finalizing PATCH's product for market and sale.

94.     PATCH is entitled to damages in an amount to be proven at trial, including enhanced damages as allowed by law.

**I.**     **COUNT IX: Unjust Enrichment**

95.     PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein, and brings this claim in the alternative to its breach of contract claim.

96.     PATCH provided BJN with valuable materials, specifically the PATCH Trade Secrets.

97.     BJN accepted the PATCH Trade Secrets allegedly to "provide research and development expertise to PATCH . . . ." Instead, BJN used the PATCH Trade Secrets to develop the Stolen Technology for BJN's use. BJN never paid for the use of the PATCH Trade Secrets.

The benefit received by BJN was obtained by the taking of an undue advantage of its fiduciary relationship with PATCH.

98.     Based upon fundamental principles of justice, equity, and good conscience, this Court should award PATCH actual damages in an amount to be determined at trial.

**J.     COUNT X: Exemplary Damages**

99.     PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

100.    PATCH's injuries resulted from BJN's malice which entitles PATCH to recover exemplary damages pursuant to § 41.003(a) of the Texas Civil Practice & Remedies Code.

101.    PATCH seeks exemplary damages in an amount sufficient to serve as a deterrent to the unconscionable conduct displayed by BJN.  An award of exemplary damages would not only deter BJN from taking such actions again, but would serve to warn and deter others who might consider such actions.

**K.     COUNT XI: Attorneys' Fees**

102.    PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

103.    As a result of BJN's wrongful conduct, it was necessary for PATCH to retain the legal services of the below-named law firm to protect PATCH's rights from BJN's wrongful conduct.

104.    Therefore, PATCH seeks a recovery from BJN for its reasonable attorneys' fees as permitted by TEX. CIV. PRAC. & REM. CODE § 38.001, *et seq.* and 18 U.S.C.A. § 1836(b)(3)(D).

**L.     COUNT XII: Agency—Vicarious Liability**

105.    PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

106.    On information and belief, at all times relevant hereto, Conyers and Jonathan Kaufmann acted as the agents of BJN, with either expressed, implied, apparent, direct, and/or ostensible authority, or BJN subsequently ratified the acts, statements, and conduct Conyers and Jonathan Kaufmann.  Accordingly, BJN is liable for the wrongful conduct of Conyers and Jonathan Kaufmann.

**M.    COUNT XIII:  Aiding and Abetting**

107.    PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

108.    Defendants aided and abetted one another in breaching their fiduciary duties to PATCH and in misappropriating PATCH's property and trade-secrets. Accordingly, Defendants are jointly and severally liable for the damages suffered by PATCH.

**N.    COUNT XIV:  Declaratory Judgment (28 U.S.C.A. § 2201)**

109.    PATCH hereby alleges and incorporates all of the preceding allegations as if set forth fully herein.

110.    Defendants claim that they had a right to develop the Stolen Technology and have ownership of the Stolen Technology. PATCH claims that the Stolen Technology was created based on the PATCH Trade Secrets and, therefore, rightfully belongs to PATCH. Therefore, an actual controversy exists between PATCH and the Defendants as to their respective rights related to the PATCH Trade Secrets, and Stolen Technology.

111.    Pursuant to 28 U.S.C.A. § 2201, the Court has the power to "declare the rights and other legal relations of" Defendants and PATCH "whether or not further relief is or could be sought." 28 U.S.C.A. § 2201.

112.    PATCH seeks a declaration of its rights in and to the PATCH Trade Secrets and

Stolen Technology. Specifically, PATCH seeks a declaration from the Court that:

a.   PATCH is the sole owner of the PATCH Trade Secrets and any derivative technology thereto, including the Stolen Technology;

b.   PATCH is the sole owner of the prototypes created by Defendants on behalf of PATCH;

c.   PATCH has the sole right of possession to the prototypes, the PATCH Trade Secrets and any derivative technology thereto, including the Stolen Technology;

d.   Defendants' use of the PATCH Trade Secrets to develop the Stolen Technology constitutes a misappropriation of trade secrets.

## VI.
### CONDITIONS PRECEDENT

113.    All conditions precedent to PATCH's claims for relief have been performed or have occurred.

## VII.
### JURY DEMAND

114.    PATCH demands a trial by jury on all issues and hereby tenders payment of the jury fee.

## VIII.
### PRAYER FOR RELIEF

For the foregoing reasons, PATCH prays for the following:

115.    A preliminary injunction and permanent injunction:

(a)    Enjoining BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them from manufacturing any products or items containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

(b)    Enjoining BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them from using any products or items

containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

(c)   Enjoining BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them from selling or offering to sell any products or items containing all or any portion of or derived from the PATCH Trade Secrets or the Stolen Technology;

(d)   Ordering BJN, its officers, agents, employees, attorneys, and all those in active concert or participation with any of them, to return to PATCH all PATCH Trade Secrets and all work product BJN performed for PATCH, including but not limited to, native CAD files, electrical schematics, PCB layout, all assembled prototypes, the bill of materials, and all technical specifications to all improvements or derivatives that BJN, or any third party, have made to the PATCH Trade Secrets or that incorporates the PATCH Trade Secrets, including the Stolen Technology.

116.   A declaratory judgment that:

a.   PATCH is the sole owner of the PATCH Trade Secrets and any derivative technology thereto, including the Stolen Technology;

b.   PATCH is the sole owner of the prototypes created by Defendants on behalf of PATCH;

c.   PATCH has the sole right of possession to the prototypes, the PATCH Trade Secrets, and any derivative technology thereto, including the Stolen Technology;

d.   Defendants' use of the PATCH Trade Secrets to develop the Stolen Technology constitutes a misappropriation of trade secrets;

117.   An award of actual and consequential damages sustained as a result of BJN's wrongful activities;

118.   An award of treble damages pursuant to the DTPA;

119.   An award of attorneys' fees and costs as allowed by law;

120.   An award of prejudgment and post-judgment interest on all sums awarded as allowed by law;

121.   Such other and further relief to which PATCH shows itself to be justly entitled.

Respectfully submitted,

_____*/s/ Jacob B. Kring*_____
**Jacob B. Kring**
Texas State Bar No. 24062831
**Joel B. Bailey**
Texas State Bar No. 24069330
**Kodie P. Bennion**
Texas State Bar No. 24064882

**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone:  (214) 880-9600
Fax:     (214) 481-1844
Jacob@HedrickKring.com
Joel@HedrickKring.com
Kodie@HedrickKring.com

and

**R. Laurence Macon**
Texas State Bar No. 12787500
**THE MACON LAW FIRM, PLLC**
750 Rittiman Road
San Antonio, Texas 78209
Phone:  (210) 961-8503
Fax:     (210) 961-8509
larry@maconlawfirm.net

**ATTORNEYS FOR PLAINTIFF**